In re HALSTEAD & CO.

(District Court, D. New Jersey. April 5, 1913.)

CORPORATIONS (§ 590*)—CONSOLIDATION—CONTRACT—ASSUMED DEBTS.

A contract for the consolidation of a firm and certain other corporations provided that the assets of the firm should aggregate $525,000, and on that basis the total amount of the firm's debts to be assumed by the consolidated corporation should not exceed $100,000, but if the assets exceeded such amount the indebtedness to be assumed might also exceed to the same extent the amount of $100,000, at the firm's option, and that any claim against the firm for work done or material furnished to their factory, building, or machinery would be assumed and paid by the consolidated company. *Held*, that such contract became functus officio as soon as the plan to consolidate was carried out, and that the consolidated company was therefore not liable for an indebtedness of the firm to certain architects for fees and services not included in the liabilities determined at the time of the consolidation, nor computed or considered at the time the corporation settled its obligation with the members of the firm under the consolidation contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2354, 2361–2367; Dec. Dig. § 590.*]

In Bankruptcy. In the matter of the bankruptcy proceedings of Halstead & Co., bankrupt. On petition to review a referee's order

allowing part and disallowing part of the claim of James E. Ware & Sons. Reversed.

McDermott & Enright, of Jersey City, N. J., for the trustee.

John W. Remer and Edo E. Mercelis, both of New York City, for the bankrupt.

CROSS, District Judge. This matter is before the court upon cross-petition to review an order of a referee, bearing date February 28, 1913, which confirmed another order of the same referee of like purport, bearing date February 19, 1912. One of the petitions for review is filed by James E. Ware & Sons, creditors of the bankrupt, whose claim was allowed by the referee in part and disallowed in part, and who complain of such disallowance. The other is filed by the trustee, who complains because of the allowance of any part of the claim of Ware & Sons. The claim in question is for architect fees and services alleged to have been performed by Ware & Sons for a partnership known as Halstead & Co., which partnership later became merged in the manner hereinafter described in the bankrupt corporation, also known as Halstead & Co. It is not claimed that Ware & Sons did any work or performed any services for the bankrupt, or that there is any direct privity of contract between them and the bankrupt. If they have any claim against the bankrupt's estate, it arises out of a clause in the agreement of consolidation, pursuant to which the bankrupt subsequently purchased the assets of the firm of Halstead & Co., and of other concerns hereinafter named. The bankrupt was originally incorporated June 14, 1901, under the name of Central Lard Company, and thereafter conducted the business of manufacturing lard at Jersey City. The partnership of Halstead & Co. had been in existence for nearly 40 years, during which time it was engaged in the meat-packing business, and in the course of such business had acquired land adjoining the factory of the Central Lard Company, with the intention of building a large packing house thereon, which it ultimately did. There was also in the vicinity a cooperage belonging to a corporation known as the Central Cooperage Company, and a stable with a large equipment of horses and wagons, which was owned by still another corporation known as the Central Trucking Company. In these latter corporations the firm of Halstead & Co. and the Central Lard Company had controlling interests. The firm of Halstead & Co. also had some interest in, but did not control, the Central Lard Company. The firm of Halstead & Co., during the period referred to, built a new packing house upon the land adjacent to the lard company's property, under the direction of Ware & Sons, and it was out of this employment that their claim now in controversy arose. Subsequently the partnership firm and the parties interested in the Central Lard Company proposed to merge the business of the firm of Halstead & Co., the Cooperage Company, and the Trucking Company into that of the Central Lard Company, and at the same time to change the name of the Lard Company into Halstead & Co. Pursuant to such intention, the consolidation agreement above referred to, bearing date

April 10, 1907, was entered into between the Central Lard Company, a corporation of New Jersey, the firm of Halstead & Co., composed of Ebenezer Hurd and James W. Halstead, the Central Cooperage Company, a New Jersey corporation, the Central Trucking Company, also a New Jersey corporation, and certain stockholders of the Central Lard Company, and other persons, whom it is unnecessary to name. It was thereby agreed that the assets of the partnership and of the several corporate parties to the agreement should be inventoried and appraised, and that from the valuations thus ascertained the indebtedness of the several parties, to an amount fixed by the agreement, might be deducted and assumed by the purchaser, and stocks and bonds in specified proportions of the purchasing corporation issued to each of the parties for the net value of the balance of its assets as thus ascertained.

The paragraphs of said agreement which relate to the appraisal and transfer of the property of the firm of Halstead & Co., and to the assumption by the purchaser of their debts, are as follows:

"III. The firm of Halstead & Company shall transfer to the new company its factory, its plant, its merchandise, stock in trade and raw and manufactured materials, its horses, trucks, wagons and harness, its dressed hog cars and all other property used by it in the transaction of its business as beef and pork packers and as slaughterers, and its accounts and bill receivable, and shall receive in payment thereof:

"First. One hundred and fifty thousand dollars ($150,000) in par value of the second mortgage bonds of the new company.

"Second. One hundred and fifty thousand dollars ($150,000) in par value in preferred stock of the said new company.

"And the remainder in common stock of the new company at par.

"IV. The valuation of the property transferred by the said firm to the new company shall be ascertained as follows: The real property, together with the plant, machinery, tools, appliances and equipments and their interest in real property owned as tenants in common with the Central Lard Company, and in the power house and machinery, tools, appliances and equipments thereof, and dressed hog cars, shall be taken at the actual costs thereof, as shown by the books. The merchandise and stock on hand, both raw material and manufactured, shall be inventoried at its market value. The accounts and bills receivable shall be taken at their face value, reserving therefrom such as were not incurred in the actual transaction of their business, and reserving also the accounts receivable of the slaughtering department to the extent sufficient to pay the debts of that department; the horses, trucks, wagons and stand in the market shall be taken at an appraised value; their interest in the stock of the Trucking Company and the M. Crane Co. shall be taken at par. From the total amounts so ascertained shall be deducted such of the debts of the firm as shall be assumed by the new company as hereinafter provided, and the balance shall be taken as the price of the firm's interest to be paid for in second-mortgage bonds, preferred and common stock at par, as above set forth. It is agreed that the assets of the firm shall aggregate in value, determined as above, the sum of at least five hundred and twenty-five thousand dollars ($525,000); and upon such basis the total amount of the debts of the firm to be assumed by the new company shall not exceed the sum of one hundred thousand dollars ($100,000); if the assets exceed such amount the indebtedness to be assumed may also exceed to the same extent at the option of the firm. Any claim against the firm for work done or material furnished to their factory, building or machinery will be assumed and paid by the new company."

At the time of the consolidation no liability to Ware & Sons appeared upon the books of the firm of Halstead & Co., which were

gone over by an accountant, and the net value of their assets was computed and turned into the new corporation without reference to any such liability, and stocks and bonds of that corporation were thereupon issued to the firm of Halstead & Co. without any deduction on account of their liability to Ware & Sons, if any.

The foregoing paragraphs taken from the agreement give the entire plan of consolidation as between the firm of Halstead & Co. and the Lard Company, as agreed upon in advance by the constituent companies. This agreement, it should be observed, was not a permanent one. Its only purpose or value was to set forth in black and white the understanding and agreement of the contracting parties, and hold them thereto until the plan of consolidation as therein outlined should be executed, the time for which, as thereby fixed, was May 1, 1907. As soon as that plan was carried out, the agreement became functus officio. Beyond the period of its consummation it had no inherent life; nor did it contain any saving clause by which life could longer be retained in it either by or for the benefit of Ware & Sons or other third party.

Turning to the agreement itself, an examination of the paragraphs referred to shows that if, upon inventory, the assets of the firm of Halstead & Co. aggregated $525,000, then the total amount of the debts of the firm to be assumed by the new corporation was not to exceed the sum of $100,000. If, however, the firm's assets exceeded the amount above named, then the firm, at its option, might add a like amount to the indebtedness which the purchasing corporation was to assume. It nowhere appears, however, but the contrary, that it was to assume all of the firm's indebtedness, or the indebtedness of any particular creditor or creditors of the firm. The purchaser was to assume, not the entire indebtedness of the firm, but its indebtedness to a limited amount only, which amount was to be deducted from the inventoried value of the property it was purchasing. Each of the constituent companies was treated in the same way, its assets were to be inventoried and valued, its debts to a prescribed amount deducted and assumed, and bonds and stocks issued to it for the difference or net value of its property, thereby completing the purchase and closing the entire transaction. The agreement in question was ultimately carried out, and the property of the firm of Halstead & Co., together with that of the other parties, acquired and paid for in accordance with its terms. To be more specific, indebtedness of the firm of Halstead & Co. to the amount of $142,-315.34, which did not include indebtedness to Ware & Sons, having first been deducted from the appraised value of its property of $595,-845.37, the corporation of Halstead & Co. paid the balance with its bonds and stocks, and by so doing paid all that it had by said agreement undertaken to pay. It has already been stated that this agreement was transitory, or, as styled by the Supreme Court of the United States in a somewhat similar case, "an executory contract inter partes." National Bank v. Grand Lodge, 98 U. S. 123, 25 L. Ed. 75. The similarity just referred to between that case and the one at bar is found in the fact that in both cases the assumption

of indebtedness was limited in amount and was conditional. In the reported case the promise to pay was contingent upon the promise to deliver certain stock, while in this it was contingent upon the indebtedness being turned in by the debtor that it might be deducted from the purchase price, and that it might be segregated from other indebtedness which was not assumed; the assumption being limited.

Ware & Sons had no knowledge of the existence of the agreement of consolidation until after it had been fully executed, and therefore had become nugatory. In Joslin v. N. J. Car Spring Co., 36 N. J. Law, 141, upon which claimants' counsel place reliance, the plaintiff, whose debt had been assumed, knew of that fact, assented to it, and acted upon it, as appears in the opinion of the court, and in those respects the case is distinguishable from the one at bar. Again, because the agreement has been executed, the interpretation and effect given it at that time are binding, not only upon the parties themselves, but upon the claimants herein. But assuming that the agreement in question was not executory, that it remained unexecuted, and that there was a direct and specific assumption by name, which there was not, of the claimants' claim, still there can be no doubt that in law the purchaser's liability under such assumption could be released at any time before the claimants had accepted or in some way acted upon the assumption, when, for the first time, they would have had a vested right therein. Crowell v. Currier, 27 N. J. Eq. 152, affirmed by Court of Errors and Appeals 27 N. J. Eq. 650; Jordan v. Laverty, 53 N. J. Law, 15, 20 Atl. 832; Keller v. Ashford, 133 U. S. 610, 624, 625, 10 Sup. Ct. 494, 33 L. Ed. 667. Unquestionably, up to the time just mentioned, the parties to the agreement could have rescinded it in toto; unquestionably they could have released any liability thereby imposed upon the corporation of Halstead & Co. in favor of the claimants; and unquestionably, when the parties met to consummate the agreement, they could, by common consent and agreement, have waived the performance of any part or parts thereof, or could have modified, changed, or altered any of its terms; and this, as to such changes as were made, if any, is what in law, in the absence of fraud, they must be presumed to have done when the contract was carried out. The presumption, in the absence of evidence to the contrary, is that the agreement was executed as the parties desired and intended it should be, and if the facts show that its execution varied in any respect from its terms, then the extent of such variation must be taken as measuring the extent of a modification in the terms of the agreement, to which the parties must be taken to have assented.

The firm of Halstead & Co., when the agreement was executed and its property transferred, deducted from its inventoried value such of its debts as it chose and the agreement permitted, and received the balance as the purchase price of its property. In other words, it received the full amount coming to it for the value of its property according to the terms of the contract, and the purchaser, after assuming certain specified debts, paid the balance of the purchase price, and cannot be made to pay anything additional, either to the firm of

Halstead & Co. or to its creditors, whose debts were not included in and did not form a part of the purchase price. The contract, having been executed to the satisfaction of the parties, cannot be opened up because of the dissatisfaction of a third party. The case would manifestly be different if the claim of Ware & Sons had been deducted from the purchase price. In that case the corporation of Halstead & Co. would have in its possession moneys to which the claimants would be both legally and equitably entitled, moneys which, in fact, it held in trust for them.

As to any alleged recognition of or promise to pay the claim of Ware & Sons by letter of one of the officers of the corporation, written after the consolidation agreement was carried out, it is sufficient to say that it does not appear that such officer had any authority from the corporation to write it. Moreover, if it can be construed to contain any promise to pay, such promise was manifestly without consideration and void. Hasbrouck v. Winkler et al., 48 N. J. Law, 431, 6 Atl. 22.

This whole proceeding may properly be regarded as a questionable attempt on the part of dilatory creditors after the lapse of eight or ten years, and after a considerable part of their claim from mere lapse of time has become open to question, to deplete the assets of the bankrupt and deprive its creditors of their just dividends. Such a result should only be contemplated in a plain case where no other conclusion could legally be reached. Certainly there would be no equity in making the bankrupt in this case pay again for property which it had already fully paid for, in order that Ware & Sons might be paid their claim at the expense of genuine creditors of the bankrupt.

The conclusion that has been reached upon this part of the case renders any consideration of the merits of the claim of Ware & Sons unnecessary.

The orders of the referee under review will be reversed and set aside.